**Carl BROADWAY et al., Plaintiffs-Appellants,**

**United States of America, Plaintiff-Intervenor-Appellant,**

**v.**

**Robert CULPEPPER, Jr., et al., Defendants-Appellees.**

**No. 29391.**

United States Court of Appeals, Fifth Circuit.

March 3, 1971.

Rehearing Denied March 31, 1971.

Walker P. Johnson, Jr., U. S. Atty., Macon, Ga., for the United States.

C. B. King, Albany, Ga., Norman Amaker, Jack Greenberg, New York City, Fletcher Farrington, Walter Gorman, Attys., U. S. Dept. of Justice, Washington, D. C., for plaintiffs-appellants.

Frank S. Twitty, Camilla, Ga., L. Earl Jones, Newton, Ga., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, DYER and INGRAHAM, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this class action against the jury commissioners of Baker County, Georgia, the Negro residents claimed that members of their race have been systematically excluded from jury service in that county and seek injunctive relief.

After considerable success—impelled in no small measure by a combination of the intervening order of the District Court, the 1967 revision of the Georgia Code, and the operation of the Voter Rights Act of 1965—the plaintiffs and intervenor appeal. Basically the contention is that there is too wide a disparity [1] between the demographic patterns in the county (52 Negro, 48% white) and the relative percentages of each on the voter registration list (37% Negro, 63% white). If the voter list produces a jury list showing substantial disparity with the voter list, the Constitution and the Georgia law [2] require

---

1. For a discussion of the meaning and significance of these disparities, see Gewin, The Jury Selection and Service Act of 1968, 20 Mercer L.Rev. 349, 367 (1969).

2. The key Georgia provision for the compiling of the jury list reads as follows:
   "At least biennially, or, if the judge of the superior court shall direct, at least annually, on the first Monday in August, or within 60 days thereafter, the board of jury commissioners shall compile and maintain and revise a jury list of intelligent and upright citizens of the county to serve as jurors. In composing such list the commissioners shall select a fairly representative cross-sec

that the jury list be supplemented by other sources. Here the jury list shows substantially the same percentages as the voter list, and this raises questions whether in the *Swain* [3] sense, the disparity between demographic pattern (48% white, 52% Negro) and the jury list (66% white, 34% Negro) is tolerable. We do not reach that question as such. We vacate the denial of relief and remand for proper determination on an up-to-date record.

Not with the purpose of disparaging either Court or counsel, the chronology of this case has a direct bearing on the remedy we employ. The suit was filed in 1966 complaining of the existing situation. The Government intervened [4] in June 1967, and an evidentiary hearing was held in October 1968. That hearing

concerned itself with the adequacy of the 1967 jury list. On May 6, 1969 the Court by interim decree found the jury list to be constitutionally unacceptable and ordered the jury commissioners to abandon the current list and draw up and present a new jury list "in strict accordance with the law of Georgia and the federal constitutional mandate." Recognizing that the commissioners were then likely engaged in the preparation of the 1969 jury list—now 3 years and 2 lists away from suit filing—the decree provided that the forthcoming commissioners' list would suffice if it accomplished what was "required by this decree in regard to the compiling of a new list" and to that end it prescribed that "an affirmative and documented showing of such fact must be made forthwith to the Court." [5] On motion of

---

tion of the intelligent and upright citizens of the county from the official registered voters' list which was used in the last preceding general election. If at any time it appears to the jury commissioners that the jury list, so composed, is not a fairly representative cross-section of the intelligent and upright citizens of the county, they shall supplement such list by going out into the county and personally acquainting themselves with other citizens of the county, including intelligent and upright citizens of any significantly identifiable group in the county which may not be fairly representative thereon.

After selecting the citizens to serve as jurors, the jury commissioners shall select from the jury list a sufficient number of the most experienced, intelligent and upright citizens, not exceeding two-fifths of the whole number, to serve as grand jurors. The entire number first selected, including those afterwards selected as grand jurors, shall constitute the body of traverse jurors for the county, except as otherwise provided herein, and no new names shall be added until those names originally selected have been completely exhausted, except when a name which has already been drawn for the same term as a grand juror shall also be drawn as a traverse juror, such name shall be returned to the box and another drawn in its stead."

Geo.Code Ann. § 59–106 (1969 Supp.) Prior to the enactment of this statute in March 1967, the tax digest was the exclusive source of juror names.

3. Swain v. Alabama, 1965, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

4. Under 42 U.S.C.A. § 2000h–2, § 902 of the Civil Rights Act of 1964.

5. "In entering this decree the Court takes judicial notice of the fact that Georgia law requires the Jury Commissioners to recompile the jury lists periodically and the Court is aware that at the time hearing was conducted on this matter there was discussion of the prospect that another revision of the jury lists in Baker County have been completely revised since the date of hearing on this matter the Jury Commissioners may have taken action on their own initiative to correct the defects and deficiencies heretofore noted with regard to the lists which were in existence at the time of hearing. It would not be the intention of the Court to impose a needless burden in time and expense on the County and with this in mind, it is, therefore, provided by this decree that if such as is required by this decree in regard to the compiling of a new list has already been accomplished by the jury lists now in use an affirmative and documented showing of such fact must be made forthwith to the Court. Such showing shall include but is not limited to the following:

1. A list of all persons whose names appear on the present jury rolls—traverse and grand jury—with the race of each juror indicated.

2. A list of the registered voters used by the Jury Commission with the race of each person indicated.

the Government and plaintiffs, an evidentiary hearing was held in October 1969 and a decree declining to compel further revisions was entered December 15, 1969.

Thus we get a 1966 case, expanded into a 1967 case, then a 1969 case in 1970 for disposition now in 1971 and probably on the eve of compiling the new 1971 jury list. In a case which follows the commendable form of anticipatory injunctive relief for the future,[6] rather than the post-event attack on validity of a criminal conviction[7] or judgment in a civil suit[8] we decline to approach a problem so directly related to the vital jury institution, Preston v. Mandeville, 5 Cir., 1970, 428 F.2d 1392, on a record which is inescapably stale when we know that much has happened —hopefully for the good—in the meantime.

This brings us to the facts revealed in the October 1969 "showing". But before discussing them or their significance it bears repeating that it was the District Court—not the request of Plaintiffs and Government—that required the showing. We are not, therefore, reviewing a question of whether an explanatory showing should have been ordered.[9] Rather, the question is whether on this record the showing ordered by the Trial Court was adequate.

According to the 1960 Census the over 21 population of Baker County consisted of 48% whites and 52% Negro and totaled 2,233.[10] The new 1969 traverse jury list approved by the District Court contained 590 names of which 384 or 66% were white and 206 or 34% were Negro. The new grand jury list contained 236 names of which 156 or 67% were white and 80 or 33% were Negro.

According to the Clerk of the Jury Commission these new lists were drawn largely from the list of registered voters. The voter list contained 2525 names—1581 or 63% were white and 944 or 37% were Negro. This corresponded closely to the 66%/34% traverse jury list. The jury commissioners

---

3. All sources from which names of jurors were secured in addition to the registered voter lists. If other lists were used, submit copies of such lists with indication of the origin of each.
4. A list of traverse jurors serving at each term of court held since the present list was put into use with the race of each juror shown thereon.
5. A list of grand jurors serving at each term of court held since this jury list was put into use with the race of each juror shown thereon.
6. A statement showing the percentage of persons of the Negro race on each of the above lists."

6. See Billingsley v. Clayton, 5 Cir., 1966, 359 F.2d 13, cert. denied, 1966, 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74; Salary v. Wilson, 5 Cir., 1969, 415 F.2d 467.

7. See Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, cert. denied, 1967, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (en banc); Scott v. Walker, 5 Cir., 1966, 358 F.2d 561 (en banc); Davis v. Davis, 5 Cir., 1966, 361 F.2d 770 (en banc); Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34 (en banc); Labat v. Bennett, 5 Cir., 1966, 365 F.2d 698, cert. denied, 1967, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (en banc).

8. See Jackson v. Morrow, 5 Cir., 1968, 404 F.2d 903.

9. See Judge Thornberry's interesting opinion for us on shifting presumptions and burdens in Colson v. Smith, 5 Cir., 1971, 438 F.2d 1075.

| 10. | White | Negro | Total |
|---|---|---|---|
| Males | 517 (49.3%) | 532 (50.7%) | 1049 (100%) |
| Females | 555 (46.9%) | 629 (53.1%) | 1184 (100%) |
| TOTAL | 1072 (48.0%) | 1161 (52.0%) | 2233 (100%) |

sent questionnaires [11] to all of these eligible voters inquiring as to their qualifications and willingness to perform jury service. 550 indicated they wished to be on the jury. 485 were either dead, claimed statutory valid exemptions, or were nonresidents. About 1,000 questionnaires were returned to the Jury Commission as undeliverable for insufficient address, while 500 or more were returned unsigned. The commissioners also asked three local Negroes to supply a list of Negro citizens who might be interested in or eligible for service. All but four of the names submitted, however, were duplicative of the names already on the voter registration list. Although the commissioners did use the telephone book, this was for verification of addresses, and not to procure new names. But apparently this procedure too would have produced negligible results.[12]

■ Georgia, as does the Federal Jury Service and Selection Act of 1968, 28 U.S.C.A. § 1861 et seq., calls for the primary use of the voter registration list as the source of names. Each, however, almost in constitutional terms, see Camp v. United States, 5 Cir., 1969, 413 F.2d 419, cert. denied, 1969, 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434, calls for a fair cross-section of the community and requires the use of supplemental sources [13] if the use of voter lists does not reflect that cross-section. See Turner v. Fouche, 1970, 396 U.S. 346, 355–356, 90 S.Ct. 532, 537–538, 24 L.Ed.2d 567, 575–576. The use of voter list is not the end sought. Rather, that is the principal source. If the source is deficient or infected its use alone will not suffice.[14]

■ In the posture of this record the showing that this voter list would produce a fair cross-section is itself inadequate. Out of 2,500 names only 550 were effectively available. And assuming, without deciding, that of the 485 living and resident and the 500 returning but not signing the questionnaire were available, the fact remains that 40% could not even be used in the process of selective or random choosing because 1,000 questionnaires were returned as undeliverable. A list—this constitutes the "universe"—which is only 60% useable is hardly a source reflecting the community from which a fair cross-section may be obtained unless there is proof—lacking here—that the composition of the 40% remnant is comparable to the 60% available. The vice becomes more critical where, as in Georgia (see note 2, *supra*) the process is one of selecting "upright and intelligent" persons out of the voter list, not, as under the Federal Act a *random* selection from the voter list, 28 U.S.C.A. § 1863. It is one thing to make this highly individualized selection from a small segment—500 names, 20%—quite another if the whole—2,500 names, 100%—is the starting point. The field is severely narrowed and, in the absence of countervailing proof this enhances both the likelihood that the smaller segment is not truly representative as well as the opportunity for discriminatory application of the subjective qualifications.

11. The questionnaire and the transmittal letter were in peremptory terms requiring the recipient to fill out and return it.

12. The Government claims that there are 70 names (actually there are 66) in the phone book that are not on the voters list and that if these people were contacted the jury lists might show a considerably different racial makeup. Yet it would appear that 28 of these people in the phone book are on the voter list under a different name, 5 are listed the same in the phone book and on the voter list, 9 are deceased, and 17 are nonresidents. This leaves at the most 6 people from the phone book who are not on the voter list. Regardless of the eligibility or race of these six, the final percentages would not be markedly different than they are without these names.

13. See Gewin, The Jury Selection and Service Act of 1968, 20 Mercer L.Rev. 349, 383–84 (1969).

14. Normally, corrective action would take the form, not of picking out supplemental sources, but of eradicating the error in the primary source. See, e. g., Preston v. Mandeville, 5 Cir., 1970, 428 F.2d 1392.

We do not hold that to be acceptable a voter list must be 100% accurate, nor that 100% of the listed voters must return questionnaires. What we hold—under Georgia law without ever orbiting to a federal constitutional apogee—is that the deficiencies of the kind and extent shown here constitute an insufficient showing—as mandated by the Trial Judge—that the 1969 jury list accomplished what his decree [15] required. (See note 5, *supra*).

■ There is an additional deficiency in the showing. This relates to the use of the subjective qualifier "upright and intelligent" persons. (See note 2, *supra*.) As to this, five things are revealed by this record. First, this was used as a basis for selection—more accurately, a basis for exclusion. Second, it was applied to exclude some Negroes. Third, who they were or how many is unknown. Fourth, what the basis was for such exclusions is unknown. But fifth, and probably most important, a standard was sometimes used which is simply not acceptable. In short, it was that a Negro was unacceptable if he had never been in a courtroom before, presumably as a defendant in a criminal case, a party in a civil case, a witness in either or a spectator.[16]

Although this Georgia qualifier was upheld in Turner v. Fouche, 1970, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567, following Carter v. Greene County, 1970, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549, the Court recognized the great potential for covert discrimination, the need for accessibility to federal courts to correct misapplications or abuse, and indeed reversed the fact findings of the three-Judge Federal District Court primarily because of the manner in which exclusions for non-uprightness-intelligence were handled. 396 U.S. at 359–360, 90 S.Ct. 532 at 539–540, 24 L.Ed.2d at 578–579. The record before us is, if anything, even more unsatisfactory. It does not show how many of either race were excluded or the reasons why in any given case. And the only reason revealed must patently be unacceptable unless we are going to sanction the like rejection of housewives who, with a mixture of dismay, bewilderment, awe, anxiety—and too often a well-grounded feeling that too much time is squandered—make their solo flight to the courthouse as a summoned juror. And that experience is bi-sexual. It would be strange if diffidence, timidity or for that matter a little fright at new surroundings and new crucial citizen responsibilities were to be disqualifiers.

■ The upshot is that the showing was insufficient. What remedy should we prescribe? A reversal as such hardly seems advisable, especially as any such action might be mis- or over-read in any post-event attempt to overcome an intervening conviction or civil judgment.

---

15. The decree of May 1969, enjoined the jury commissioners "from failing to take all necessary steps to ensure that the jury lists reflect a representative cross-section of the adult population of Baker County, Georgia." The decree additionally ordered them to "compile a new jury list in strict accordance with the law of Georgia and the federal constitutional mandate."

16. When asked why there were so few Negroes on the jury rolls, the clerk of the Jury Commission stated:

"A. Well, I can tell you why there's not any more on there. We picked what we felt was the most intelligent and upright colored people there was in the County and put them on there; and we've got some people down there that couldn't give a fair verdict in a courtroom because they've never been in a courtroom, and they're on the voters' list but you don't put that kind of people in a jury box.

Q. I see. So, there are, in your judgment, blacks who could not give a fair verdict because they haven't been in a courtroom before?

A. Ain't never been in a courtroom or in trouble before in their life. It would scare them to death if you were to call them and sit them down on the jury.

Q. I see; and that is the only explanation is that correct?

A. We picked the most intelligent colored citizens we had in the County and put them in the jury box."

(See notes 6, 7, and 8, *supra*.) At the same time we cannot allow the judgment to affect the future. To attain both objectives we think our action should be to vacate the decree and remand.

What should be done on remand? Obviously nothing is to be gained by poking around in old 1966, 1967, 1969 ashes. What is desired—what Georgia law and the Federal Constitution demand—is a valid jury list. That looks to the present and the future. As it is almost certain that a 1971 jury list is or will here to be constructed under the time mandate of the Code [17] (see note 2, *supra*) the District Court should do much as it did in May 1969—require a new jury list to be compiled subject to a showing that it meets the stringent commands of Georgia and the Federal Constitution. The matter should be expedited. Upon completion of the new 1971 list the showing by the jury commissioners shall be not less detailed and exacting than before. (See note 5, *supra*). Additionally it must cover the matters discussed by us covering both the voter lists and the jury lists. Helpfully the 1970 Census figures will afford an up-to-date basis for checking the completeness and accuracy of the voter lists. The Court must also require that effective means are used to assure return of questionnaires properly filled out and signed and a suitable followup procedure for actual delivery of those returned as undeliverable. Of great importance, the commissioners must also show the name and race of every person not selected [18] because he is not upright or intelligent and specifically the reasons [19] underlying that subjective conclusion in each instance.

What we are doing is essentially that done in Preston v. Mandeville, 5 Cir., 1970, 428 F.2d 1392; Raiford v. Dillon, 5 Cir., 1970, 430 F.2d 949; and Ford v. White, 5 Cir., 1970, 430 F.2d 951. We would stress, as *Preston* [20] made explicit, that in injunctive cases the Court may exact from officials responsible for the construction of jury lists a high standard of comparability between demographic percentages and those of the jury list.

In assaying a jury list for the future —not past—there is opportunity for corrective action to eliminate or alleviate

17. In any event the Code permits new lists annually.

18. The Court has ample resources to permit counsel and parties to have and use this information and, at the same time, avoid needless embarrassment to the individuals rejected.

19. Although the Georgia Code (note 2, *supra*) apparently permits an initial, deliberate, selective choice of those determined to be "upright and intelligent" so long as the total result meets the fair cross-section standard, much difficulty would be avoided by employing the non-upright-intelligent qualifier as an exclusion from those names selected at random from a corrected reliable voter list. "The most obvious numerical selection system [to insure randomness] * * * is a simple numerical selection system. For example, if the source list contains 20,000 names, the required 1,000 names can be selected randomly by taking every twentieth name on the list. To ensure complete objectivity, the starting point can be determined by a drawing; *e. g.*, if the number drawn is 15, then the next numbers selected will be 35, 55, 75, *et cetera ad finem*." Gewin, *supra*, note 13 at 359. The name of any person on the random list thought to be not qualified would then be removed and a replacement would in turn be picked at random, and so on until the final list was compiled. In this way the laws of chance alone would account for the presence of every one on the jury list and leave as to this aspect the sole question whether there was a legally sustainable basis for the exclusions as not upright or intelligent.

Although we do not at this time pass on or intimate any decision on whether this suggested "random-exclusion" process may be compelled, we point out that the burdens of explanation or justification considerably increase as the subjective qualifier is first impelled for *in*clusion, not exclusion.

20. Judge Bell stated for us "it is important to the stability of the law that [jury list officials] have a duty, stemming from their public positions, over and above that common amongst defendants, to justify the validity of the jury system from a constitutional standpoint," *Preston, supra*, 428 F.2d at 1394.

deficiencies within both the minimum and maximum constitutional concepts of a fair cross-section. Thus we can hope for the greater precision which may readily be obtained.[21]

Vacated and remanded.

21. Compare *Swain*, note 3, *supra*, a criminal conviction case and Turner v. Fouche, *supra*, an injunction suit. See Salary v. Wilson, 5 Cir., 1969, 415 F.2d 467.