**Will WRIGHT, Petitioner-Appellant,**

v.

**S. Lamont SMITH, Warden, Georgia State Prison, Reidsville, Georgia, Respondent-Appellee.**

No. 72-2249.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1973.

Edward T. M. Garland, Eric Welch, Atlanta, Ga., for petitioner-appellant.

Arthur K. Bolton, Atty. Gen., W. Hensell Harris, Jr., Dorothy T. Beasley, Asst. Attys. Gen., Atlanta, Ga., for respondent-appellee.

Before JOHN R. BROWN, Chief Judge, and THORNBERRY and MORGAN, Circuit Judges.

THORNBERRY, Circuit Judge:

On August 8, 1967, a predominantly white grand jury in Fulton County, Georgia, indicted Will Wright, a Negro, for murder. On September 13, 1967, having been convicted by an all-white jury, Wright was sentenced to life imprisonment.[1] On this appeal from the district court's denial of his petition for a writ of habeas corpus, Wright challenges the composition of his grand and petit juries, alleging that the method of juror selection systematically excluded Negroes and poor persons and was based on a numerically inadequate cross-section of the community. We affirm the judgment below.

Wright's grand and petit juries were selected in the following manner. The Fulton County Jury Commissioners mailed a racially neutral questionnaire to each individual who filed a county property tax return for that year.[2] When the questionnaires were returned, the Jury Commissioners excluded the names of those who, on the basis of the information supplied by the questionnaires, were exempt or disqualified from jury service. The remaining names were placed on a racially neutral master jury list. A judge drew jurors' names from this list at random; each name was placed in the jury box on a slip of paper indistinguishable from the others.

In theory, this system was a good one. Every person who owned any real or personal property was required to file a county property tax return, regardless of whether, after subtracting exemptions,[3] he would be subject to a net tax liability. Given Georgia's comprehensive definition of personal property,[4] few, if any, Georgia residents were not required to file a county tax return. Thus, the pool of prospective jurors (i. e., the tax returns) was—hypothetically—numerically comprehensive and was selected without regard to wealth. Furthermore, the system afforded no opportunity for racial discrimination, because questionnaires were sent to all persons filing tax returns without regard to race and because the questionnaires themselves disclosed nothing about a resident's race.

In practice, however, this system produced less than ideal results, owing largely to the fact that only about one-half[5] of the adult residents of Fulton

1. Wright was paroled on March 26, 1972.

2. After Wright's indictment and trial, Georgia law was changed to require the use of voter registration lists, rather than tax returns, as the basic source of of potential jurors, and to require that the voter registration list be supplemented if it does not reflect a fairly representative cross-section of a county's population. Ga.Acts 1968, p. 533, codified in Ga.Code Ann. § 59–106 (Supp.1972).

3. At the times in question, Georgia law exempted up to $2,000 of the value of a home, Ga.Code Ann. § 92–219; $300 of the value of personal property such as clothing, furniture, domestic animals and tools, Ga.Code Ann. § 92–239; land held for charitable, religious, educational, or other eleemosynary purposes, Ga.Code Ann. § 92–130; and property owned by certain foreign corporations, Ga.Code Ann. § 92–201.

4. Ga.Code Ann. § 92–102 provides as follows:

For the purposes of taxation, "personal property" shall be construed to include goods, chattels, moneys, credits and effects, whatsoever they may be; ships, boats, and vessels, whether at home or abroad, and capital invested therein; bonds and other securities of corporations of this or of other States; stock of corporations of other States; bonds, notes or other obligations of other States, and of the counties, municipalities or other subdivisions thereof; money due on open account or evidenced by notes, contracts, bonds, or other obligations, secured or unsecured.

5. Of the 168,003 tax returns filed in 1965, an unknown number were filed jointly by husband and wife. If both husband and wife were twenty-one years of age or older, each joint return would represent two potential jurors, rather than one. Thus, much more than one-half of the Fulton County adult population may have been represented in the total returns filed.

County filed tax returns in 1965.[6] A larger percentage of the white population than of the black population filed returns, resulting in the overrepresentation of whites in the pool of prospective jurors. Thus, although whites outnumbered blacks in Fulton County by a ratio of two to one (68 percent white to 32 percent black), among those who filed returns and thereby entered the pool of prospective jurors, whites outnumbered blacks by more than *five* to one (84 percent white to 16 percent black). Wright's grand jury and the petit jury panels actually drawn for his trial contained roughly the same percentage of blacks as did the tax returns. There were, according to the testimony of the jury clerk, "three or four" Negroes on Wright's grand jury, meaning that the grand jury that indicted Wright was 13 or 17 percent black. And although the jury that convicted Wright was lily-white, there were "between seven and twenty-one" Negroes on the five petit jury panels from which Wright's trial jury was chosen, the percentage of blacks on the jury panels thus ranging from roughly 12 percent to 35 percent. In short, there was no significant disparity between the percentage of blacks in the pool of prospective jurors (16 percent) and the percentage of blacks on Wright's grand jury and his petit jury panels.[7] Bearing these facts in mind, we turn now to appellant's contentions.

■■ In order to have made a *prima facie* showing of systematic exclusion of blacks from his grand and petit juries, appellant had the burden of proving, first, that the opportunity for racial discrimination existed by reason of the use of a racially biased source of potential jurors, and, second, that the use of such an "infected source" produced a significant disparity between the percentages of blacks in the source and the percentage on the grand jury and petit jury panels. Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Jones v. Smith, 5th Cir., 1969, 420 F.2d 774. In the instant case, appellant has shown neither. We have seen above that the percentages of blacks on the grand jury (13 or 17 percent) and on the petit jury panels (12 to 35 percent) were not significantly lower than the percentage of blacks in the pool of prospective jurors (16 percent); in fact, the percentage of blacks on the grand jury and the petit

6. Testimony in the district court revealed that there were no criminal sanctions for failure to file a county tax return, and that the supervising tax clerk of The Fulton County Tax Commissioner's Office believed that his office was inadequately staffed to enforce the filing requirement by assessing penalties against those persons failing to file.

7. The foregoing statistics may be summarized as follows (percentages are approximate):

| Group | Nonwhite or Negro | White | Total |
|---|---|---|---|
| Fulton County Adult Population (1960) | 108,013 (32%) | 231,045 (68%) | 339,058 (100%) |
| 1965 Tax Returns | 26,518 (16%) | 141,485 (84%) | 168,003 (100%) |
| Percentage of each race filing tax returns | 24.5% | 61% | — |
| Appellant's Grand Jury | 3 or 4 (13% or 17%) | 19 or 20 (83% or 87%) | 23 (100%) |
| Appellant's Petit Jury Panels (5 panels of 12) | 7 to 21 (12% to 35%) | 39 to 53 (65% to 88%) | 60 (100%) |
| Appellant's Petit Jury | 0 (0%) | 12 (100%) | 12 (100%) |

jury panels may have been higher than in the pool. Moreover, the system used in selecting grand and petit jurors in appellant's prosecution afforded little, if any, opportunity for racial discrimination. Racially neutral questionnaires were sent to all persons filing tax returns; the Jury Commissioners excluded exempt or disqualified persons from the list without regard to race; the remaining names were placed in the jury box on indistinguishable slips of paper. This system contrasts starkly with the use of such an "infected source" as multi-colored tax returns bound into the tax digest by race, the method used in Georgia until shortly before the instant prosecution was brought,[8] and a system which has been consistently condemned.[9] It is true that there was a significant disparity between the percentage of blacks in Fulton County and the percentage of black grand and petit jurors; but this disparity was due not to the use of a racially biased source of potential jurors, but rather to the fact that a greater percentage of whites than of blacks fortuitously filed tax returns and thereby entered the pool of prospective jurors. Absent proof that selection procedures are biased, proof of disparity between racial percentages in the population and on the juries is not sufficient to shift the burden of explanation to the state. *Alexander, supra,* 405 U.S. at 630, 92 S.Ct. at 1225.[10]

■ We also reject appellant's contention that use of tax returns as the source of potential jurors resulted in systematic exclusion of poor persons from his grand and petit juries. Appellant argues that use of the tax returns automatically excluded persons owning less than a minimum amount of property.

8. Indeed, some jurors for the period during which appellant was indicted and tried had been selected through reliance on the infamous multi-colored tax returns, but that system was abandoned and a complete group of jurors chosen by means of racially neutral questionnaires after the Jury Commissioners were informed that the old method was unconstitutional. For a discussion of this hasty change in the manner of selecting jurors, and approval of the method used in the instant case, see Lumpkin v. Smith, N.D.Ga.1970, 309 F.Supp. 1325, rev'd. on other grounds, 5th Cir. 1971, 439 F.2d 1084.

9. E. g., Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Colson v. Smith, 5th Cir. 1971, 438 F.2d 1075; Davis v. Smith, 5th Cir. 1970, 430 F.2d 1256; Jones v. Smith, 5th Cir. 1969, 420 F.2d 774; Peters v. Rutledge, 5th Cir. 1968, 397 F.2d 731; Vanleeward v. Rutledge, 5th Cir. 1966, 369 F.2d 584. Cf. Labat v. Bennett, 5th Cir. 1966, 365 F.2d 698, cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967) (indirect discrimination through exclusion of daily wage earners).

10. In Gibson v. Blair, 5th Cir. 1972, 467 F.2d 842, another panel of this court held that a *prima facie* case of discriminatory jury selection was established by proof that "a significant disparity exists between the percentage of blacks chosen for jury duty and the percentage of blacks eligible for jury duty in the population from which jurors are drawn." 467 F.2d at p. 844. We do not believe that this opinion, by suggesting that proof of a racially biased selection method is not part of a *prima facie* case, is in conflict with what we hold in the instant case. First, all of the cases cited in *Blair* as supporting that proposition involved not only a significant disparity in racial percentages, but also either a racially biased selection system (e. g., jurors selected through reliance on personal knowledge of jury commissioners who knew few, if any, Negroes; automatic exclusion of predominantly Negro economic classes) or a history of decades during which no members of racial minorities had sat on juries. Secondly, the primary question before the court in *Blair* was not whether a *prima facie* case had been established, but rather whether the state trial court had erroneously excluded all evidence except that tending to show *intentional* discrimination by the jury commissioners. Significantly, the court in *Blair* pointed out that the record before it, containing proof of discrepancy between racial percentages without more, did not establish racial discrimination in the general venire of Washington Parish, 467 F.2d at 844.

This is not true, because wealth did not determine whether a person was required to file a tax return. Every person who owned property (and it is difficult to imagine persons whose possessions would not be included in the all-embracing Georgia definition of property) was required to file a tax return, regardless of whether the value of his possessions exceeded the exemptions provided by Georgia law. Whatever else may have caused roughly half of the Fulton County population to refrain from filing returns and thus from entering the pool of prospective jurors, it was not poverty. Moreover, this court has on at least two occasions in the past upheld the nondiscriminatory use of tax returns as a source of potential jurors. Donlavey v. Smith, 5th Cir. 1970, 426 F.2d 800; Roach v. Mauldin, 5th Cir. 1968, 391 F.2d 907, cert. denied, 393 U.S. 1095, 89 S.Ct. 884, 21 L.Ed.2d 786 (1969).[11]

■ There remains appellant's contention that, apart from considerations of racial or economic discrimination, the tax returns afforded a numerically inadequate cross-section of the community, because tax returns represented only about half of the Fulton County residents eligible for jury service. In Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), the Court suggested that a state has a duty to select prospective jurors from as comprehensive a list as possible; and a panel of this court, in Broadway v. Culpepper, 5th Cir. 1971, 439 F.2d 1253, hinted that the numerical inadequacy of the juror pool might be the basis for prospective remedial relief, plaintiffs having demonstrated a significant disparity between racial percentages in the population and in the prospective juror pool (in that case, the group of registered voters who had returned information questionnaires to the jury commissioners). While fully recognizing that the knowing use of a numerically inadequate source of potential jurors will often deny an accused his right to a jury selected from a fairly representative cross-section of the community, we hold that appellant in this case did not make a burden-shifting *prima facie* showing that his grand and petit jurors were selected from a numerically inadequate pool. First, we have no way of knowing exactly what percentage of the adult population of Fulton County actually entered the pool of prospective jurors. Although only 168,000 tax returns were filed out of a population of 339,000, some of these returns must have been filed jointly by couples both of whom were twenty-one years of age or older. *See* footnote 5 *supra.* Depending on how many of these joint returns were filed, the pool of tax returns could represent vastly more than roughly one-half of the adult population. Secondly, even disregarding the joint return factor, a pool of one-half the adult population is nowhere near as suspect as was the pool in *Broadway, supra,* which reflected only about *one-quarter* of the adult population. Under these circumstances, and considering the absence from this case of racial or economic discrimination, we must reject appellant's claim that his grand and petit juries were not chosen from a fairly representative cross-section of the community.

Affirmed.

11. Cf. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), upholding the use of a list of county property and poll taxpayers as the most comprehensive available source of potential jurors.