Belle Few **THOMPSON**, et al., etc., Plaintiffs-Appellants,

v.

Max **SHEPPARD**, Jr., et al., etc., Defendants-Appellees.

No. 73–2519.

United States Court of Appeals, Fifth Circuit.

March 8, 1974.

---

C. B. King, Herbert E. Phipps, Albany, Ga., Jack Greenberg, Charles S. Ralston, New York City, for plaintiffs-appellants.

Jesse W. Walters, M. Baker Wyche, III, Albany, Ga., for defendants-appellees.

Before COLEMAN, AINSWORTH and GEE, Circuit Judges.

COLEMAN, Circuit Judge:

This is an action brought pursuant to 42 U.S.C., § 1983 on behalf of black and female citizens of Dougherty County, Georgia, to enforce their right to serve on grand and petit juries in the courts of that county.

A preliminary injunction at the outset of the proceedings resulted in the compilation of a new jury list, drawn by chance from county voter lists. After a hearing, the District Court approved this list. Plaintiffs are not satisfied and brought this appeal. We affirm the judgment of the District Court.

According to the 1970 Census, Dougherty County then had 48,444 inhabitants over twenty-one years of age.

By percentages, this age group divides statistically into the following characteristics:

| | |
|---|---|
| White, male and female, over 21 years of age | 69.29% |
| Blacks, male and female, over 21 years of age | 30.23% |
| Black males | 12.73% |
| Black females | 17.49% |
| White males | 35.49% |
| White females | 35.19% |

There were 29,204 voters, as determined at the previous general election.

After the District Court prohibited the further use of the existing jury list and directed the compilation of a new one which would pass constitutional muster, a new jury list was compiled by a computer process which automatically selected every fourth name on the voter list, a total of 7,308 individuals (3,507 males and 3,801 females). Seventy five per cent of the names so selected were of white persons and 25% were of black persons, a variation of 5% from the actual racial population proportions of the county.

These 7,308 individuals were sent a racially neutral questionnaire. Of this total, 1,240 were returned by the post office, addressee unknown, while 1,489 addressees simply failed to return the questionnaire at all. 1,078 females claimed the exemption allowed them upon request by Georgia law, 195 individuals claimed an occupational exemption, 224 claimed the over age exemption, 228 cited physical disability, 24 were unable to read or write, 102 were students away at college, and 9 were dead. The record fails to reveal the race of these various groups.

This left a master jury pool of 2,721 names, selected solely by objective methods, with no subjective considerations entering the picture. Of these 2,721, 37.9% were women, which would

appear to settle their presence in substantial numbers and we devote no further discussion to that aspect of the case.

Racially, the master jury pool turned out to be composed of 2199 whites (80.8%) and 522 blacks (19.2%).

This results in the following comparisons: Total black population over age twenty-one, 30.23%; percentage of blacks on the jury list, 19.2%. Thus the jury list fell 11% short of proportionate population representation. The record is silent as to how much of this disparity was due to exemptions claimed, inability to deliver the questionnaires, and failure to return them. In any event, the names randomly selected by the computer were within 5% of racially proportionate to the population and there is not a hint that any name was thereafter rejected for any subjective reason.

Plaintiffs rely on Broadway v. Culpepper, 5 Cir., 1971, 439 F.2d 1253 as authority for the proposition that the above method of compiling the jury lists failed to produce the required fairly representative cross section of the inhabitants of the county and argue that supplemental methods should have been used to produce a jury list in which the percentage of black jurors would more nearly approach the actual percentage of those over twenty-one years of age residing in the county.

We must first point out that *Broadway* was not a case in which the jury list had been drawn at random by computer from the voter list, although the Court took pains to praise that procedure [Footnote 19, 439 F.2d at 1259]. Moreover, the *Broadway* Court was careful to emphasize that "Obviously nothing is to be gained by poking around in old 1966, 1967, 1969 ashes. What is desired—what Georgia law and the Federal Constitution demand—is a valid jury list". The case was remanded for further proceedings on a fresh, rather than a stale, record. The District Court was told, however, that in formulating a new jury list the jury commissioners should use "effective means to assure the re-turn of the questionnaires properly filled out and signed and a suitable follow up procedure for actual delivery of those returned as undeliverable". Finally, the Court expressly declined to define what is required to constitute a fairly representative cross section of the community vis-à-vis comparison with demographic percentages.

We turn for guidance to the decisions of the Supreme Court of the United States. We look first to Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). This was a Georgia case, originating in Taliaferro County, where 60% of the inhabitants were black. The jury list was not drawn at random. The commissioners pared the voters list of 2,152 down to 608. These names were listed in alphabetical order and every other name (304) was carried forward to a new list, 191 white and 113 black. Further refinements resulted in a grand jury of 17 whites and 6 blacks. 171 Negroes had been eliminated from the list as unintelligent or not upright. The Supreme Court held that Negroes composed only 37% of the 304 member list from which the grand jury was drawn, that this contrasted "sharply with the representation that their percentage (60%) of the general Taliaferro County population would have led them to obtain *in a random selection* (emphasis ours)".

The Supreme Court then added, "In the absence of a countervailing explanation by the appellees, we cannot say that the underrepresentation reflected in these figures is so insubstantial as to warrant no corrective action by a federal court charged with the responsibility of enforcing constitutional guarantees".

It must be remembered that the Supreme Court, 396 U.S. at 360, singled out the use of subjective judgment rather than objective criteria as one of the causes of the impermissible disparity.

In short, there was subjective selection of jurors, there was no drawing at random from the whole body of voters, and 60% of the population wound up with only 25% of the grand jurors.

Obviously, the case now before us is not such a case as Turner v. Fouche.

Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549, was decided the same day as Turner v. Fouche. In *Greene* the jurors were not selected at random from the whole body of eligibles. Although 65% of the population was black, only 32% of those on the jury roll were black. The discriminatory character of the jury lists was conceded but the Court declined to order the appointment of Negro commissioners, saying, "The appellants are no more entitled to proportional representation by race on the jury commission than on any particular grand or petit jury".

Mr. Justice Douglas dissented in part because he thought the selection of black jury commissioners should be compelled, but wrote:

"We have often said that no jury need represent proportionally a cross-section of the community. See Swain v. Alabama, 380 U.S. 202, 208–209, [85 S.Ct. 824, 829–830, 13 L.Ed.2d 759]; Cassell v. Texas, 339 U.S. 282, 286–287 [70 S.Ct. 629, 631–632, 94 L. Ed. 839]. Jury selection is largely by chance; and no matter what the race of the defendant, he bears the risk that no racial component, presumably favorable to him, will appear on the jury that tries him. The law only requires that the panel not be purposely unrepresentative. See Whitus v. Georgia, 385 U.S. 545, 550 [87 S.Ct. 643, 646, 17 L.Ed.2d 599]. Those finally chosen may have no minority representation as a result of the operation of chance, challenges for cause, and peremptory challenges."

This remands us to Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), which declared, "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group * * * We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%".

This followed a declaration that "a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn", 380 U.S. at 208.

We conclude that a jury list drawn objectively, mechanically, and at random from the entire voting list of a county' is entitled to the presumption that it is drawn from a source which is a fairly representative cross-section of the inhabitants of that jurisdiction. The presumption, of course, is rebuttable but the challenger must carry the burden of showing that the product of such a procedure is, in fact, constitutionally defective. In addition to the authorities already discussed, see Camp v. United States, 5 Cir., 1969, 413 F.2d 419; Wright v. Smith, 5 Cir., 1973, 474 F.2d 349.

More specifically, in the case now under review we hold that the plaintiffs failed to carry the burden of showing that the Dougherty County jury list was not drawn from a source which was fairly representative of the inhabitants and that they accordingly failed to establish constitutional deficiency on account of racial discrimination in the selection of the jury. As was pointed out in Broadway v. Culpepper, *supra,* the time is at hand for the selection of a new jury list. As in *Broadway,* we remind the defendant-appellees that they should prosecute a more effective follow-up on those whose questionnaires are not delivered and on those who fail to return their questionnaires. A County which has embarked upon a wholly objective method of compiling its jury list, substantially utilizing the same procedure used for the compilation of jury lists in the federal court system, will no doubt comply with these details. If they do not, plaintiffs-appellants, in the exercise of their usual diligence, have the right effectively to question it.

The jury commission, composed of whites, blacks, and women, selected the grand jury list according to the method which the Supreme Court declined to condemn in Turner v. Fouche, *supra*, and we see no reason to hold it fatally defective.

The judgment of the District Court is Affirmed.