Belle Few THOMPSON et al., etc.,
Plaintiffs-Appellants,

v.

Max SHEPPARD, Jr., et al., etc.,
Defendants-Appellees.

No. 73-2519.

United States Court of Appeals,
Fifth Circuit.

Oct. 25, 1974.

C. B. King, Herbert E. Phipps, Albany, Ga., Jack Greenberg, Charles S. Ralston, New York City, for plaintiffs-appellants.

Neil Bradley, Laughlin McDonald, Emily Carssow, Atlanta, Ga., Melvin L. Wulf, New York City, amicus curiae, for American Civil Liberties Union Foundation, on rehearing.

Jesse W. Walters, M. Baker Wyche, III, Albany, Ga., for defendants-appellants.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before COLEMAN, AINSWORTH and GEE, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

JOHN R. BROWN, Chief Judge, with whom GOLDBERG, Circuit Judge, joins, dissenting:

I dissent to the Court's failure to rehear this case en banc and on such rehearing reverse and remand the cause to the District Court with appropriate instructions.

I.

It is, first, enbancworthy, FRAP 35, 28 U.S.C.A. § 46(c), as a case of major importance presenting recurring questions on which this Court in the past 20 years has spoken with a clear voice.

II.

But it is equally enbancworthy as such a case of importance because the result is, in my view, wrong and contrary to what we have consistently held.

The basic error in the beguiling opinion of the Court, Thompson v. Sheppard, 5 Cir., 1974, 490 F.2d 830, is that it confuses two things: (i) proof of discrimination by race (or sex) and (ii) the appropriate remedy once discrimination is found to exist, either in fact, in law, or both.

Although there is loose language in the Court's opinion about failure of plaintiffs to carry their burden of proof there is really no problem of burden of proof in this case. On the initial hearing the trial court assumed that the burden was on the state jury selection officials. And the defended officials, without questioning that in the least, undertook to shoulder that burden. Indeed, except for a few superficial witnesses produced by plaintiffs on aspects which the trial court thought were insignificant, all of the witnesses were put on the stand by the officials. Assaying the 1972 petit and grand jury lists the revelations of

that hearing were so shocking that the Judge from the bench held the list to be unconstitutional by reason of discrimination against blacks, as a race, and women, both white and black.

This was the picture:

### Table A

| Percentage of Blacks in the Over-21 Community | Percent on Master Jury List | Percent on Grand Jury List |
|---|---|---|
| 30.23% | 12.48% | 10.7% |

| Percentage of Women in the Over-21 Community | Percent on Master Jury List | Percent on Grand Jury List |
|---|---|---|
| 52.68% | 24% | 12.48% |

The District Court ordered the officials to compile a new list which would contain more blacks and women. On the hearing to show cause why the revised list should not be approved the officials again produced all of the testimony. This showed improvement—even substantial improvement—but again there was revealed a staggering, uncontradicted, difference between the percentage of these classes in the adult population of the county and the percentage of such classes on the petit and grand jury lists. This glaring disparity was reflected not only on the difference in percentage points but, more significantly, the percentage of underrepresentation.[1]

### Table B

|  | (1) Percentage of Over-21 Community | (2) Original Master List | (3) Revised Master List | (4) Percentage Point Difference, Column (1) Less Column (3) | (5) Percentage of Under-Representation |
|---|---|---|---|---|---|
| Blacks | 30.23% | 12.48% | 19.15% | 11.08% | 36.66% |
| Women | 52.68% | 24% | 37.90% | 14.78% | 28.06% |

|  |  | Original Grand Jury List | Revised Grand Jury List |  |  |
|---|---|---|---|---|---|
| Blacks | 30.23% | 10.7% | 16.40% | 13.83% | 45.75% |
| Women | 52.68% | 12.48% | 35.66% | 17.02% | 32.31% |

1. This was obviously regarded as the significant thing in the analysis made by the Court in this excerpt from Alexander v. Louisiana, 1972, 405 U.S. 625, 629, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536, 541:

In Lafayette Parish, 21% of the population was Negro and 21 or over, therefore presumptively eligible for grand jury service. Use of questionnaires by the jury commissioners created a pool of possible grand jurors which was 14% Negro, a reduction by one-third of possible black grand jurors. The commissioners then twice culled this group to create a list of 400 prospective jurors, 7% of whom were Negro—a further reduction by one-half. Thus, in Alexander, the Court did not subtract 7% from 14% for a disparity of only 7%, but calculated that the reduction was one-half, i. e., 50%.

Upon the completion of the initial hearing the trial court clearly recognized that it had "not merely the power but the duty to render a decree which will *so far as possible* eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Carter v. Jury Commission of Greene County, 1970, 396 U.S. 320, 340, 90 S.Ct. 518, 529, 24 L.Ed.2d 549, 563 (emphasis added), quoting Louisiana v. United States, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709. Acting under that duty the Judge ordered the preparation of a new and better list. But in the face of continued flagrant underrepresentation shown by Table B that same duty remained.

No explanations really were offered as to why that result was the best attainable "as far as possible", *Carter, supra.* And what evidence was offered, affirmatively proved a number of sources making the system vulnerable.

Intending no disparagement of the use of data computers in the law [2] the Court nevertheless seems in my view to be almost mesmerized because a data computer was used. But the role of the computer here was very limited and wholly mechanical. It did only two things. First it merely created a "universe" of 7,308 names from the most recent voter list [3] of 29,204 voters, the racial-sex-composition of which was never established. And second it identified the race-sex categories in the "universe". From that point on the computer did nothing.

But the universe of 7,308 dwindled to 2,721 in the course of the further processing by the human beings comprising the officials. This was partly because of certain exemptions, required or claimed, in the answering questionnaire. But larger in numbers, in percentages, and legal significance under this Court's holding in Broadway v. Culpepper, 5 Cir., 1971, 439 F.2d 1253 were the following:

| | |
|---|---|
| Addressees Not Returning Questionnaires | 1,489 |
| Returned By Post Office, Address Unknown | 1,240 |
| | 2,729 |

Thus the so-called computer created "random" list of 7,308 was nothing of the kind. At most the universe was reduced to 4,579. But even this was an illusion.

Although I think the Court's declaration that "a jury list drawn objectively, mechanically, and at random from the entire voting list of a county is entitled to the presumption that it is drawn from a source which is a fairly representative cross-section of the inhabitants of that jurisdiction", 490 F.2d at 833 is an acceptable working principle [4] its conclusion that the plaintiffs "failed to carry the burden * * *" of "showing

---

2. Ross v. Odom, 5 Cir., 1968, 401 F.2d 464; First National Bank of Birmingham v. Daniel, 5 Cir., 1956, 239 F.2d 801; Bush v. Martin, S.D.Tex., 1966, 251 F.Supp. 484; Brown, Electronic Brains and the Legal Mind: Computing The Data Computer's Collision With Law, 71 Yale L.J. 239 (1961).

3. Under current Georgia law, this is the "official registered voters' list . . . as most recently revised by the county board of registrars or other county election officials. . . ." Ga.Code Ann. § 59–106 (1973).

4. Under the federal Jury Selection and Service Act of 1968, 28 U.S.C.A. §§ 1861–1869, and under all plans approved by the Fifth Circuit reviewing panel, see, Gewin, The Jury Selection and Service Act of 1968, 20 Mercer L.Rev. 349 (1969), voter registration lists are the principal source. But of course the act itself requires the use of "some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S. C.A. § 1863(b)(2).

that the product of such a procedure is, in fact, constitutionally defective", *id.*, is not sustainable on this record. In the first place, there was nothing to prove —nothing, that is, beyond that shown by the testimony from the officials. And the result of the "second try" was still glaring, spectacular, underrepresentation of 36% and 45% as to blacks. (See Table B.) This was proof that for some reason the so-called random selection from the voter list was not adequate to create a fair cross-section of the community.[5] What those reasons might be, and more importantly, what steps should be taken to achieve a fair cross-section and eliminate the causes of the disparity were factual things which *Carter* and *Broadway, supra,* imposed on the officials to prove.

But having responded to the duty following the initial hearing the District Court at this point did nothing. It did not, for example, require or even consider whether sources other than voting lists ought to be used and if so what ones would be the most reliable. Nor did it require that undelivered or unanswered questionnaires be followed up.[6] Nor did it require an explanation as to why more blacks than whites were excluded when grand jurors were selected under the subjective standards of "intelligence" and "uprightness".

Finally, the Court's decision is in conflict with other decisions with regard to the degree of underrepresentation held to require further remedial action. Thus, in Turner v. Fouche, 1970, 396 U. S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567, the Supreme Court held that further relief was required upon a showing that only 37% of the master list was black in a county 60% black, an underrepresentation of 40%, and in Preston v. Mandeville, 5 Cir., 1970, 428 F.2d 1392, the master list was 16% black in a county 29.3% black, an underrepresentation of 45.4%.

I therefore respectfully dissent.

---

5. In Rabinowitz v. United States, 5 Cir., 1966 (en banc), 366 F.2d 34, 57 we declared:

> The Constitution and laws of the United States place an affirmative duty on the [jury selection officials] to develop and use a system that will probably result in a fair cross-section of the community being placed on the jury rolls.

6. In *Broadway, supra,* 439 F.2d at 1257–1258, we condemn the use of a voter list as a source where 40% of the questionnaires to the voters were undelivered. In doing so we said:

> A list—this constitutes the "universe"— which is only 60% useable is hardly a source reflecting the community from which a fair cross-section may be obtained unless there is proof—lacking here—that the composition of the 40% remnant is comparable to the 60% available.

Here of course the remnant was 37% (2,721 of 7,308) and contrasted with *Broadway* was of ¼ of the voters, not all voters.