UNITED STATES of America,
Plaintiff-Appellee,

v.

Harry Lloyd DAVIS,
Defendant-Appellant.

No. 75–3747.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1977.

J. Hue Henry, Athens, Ga. (Court-appointed), for defendant-appellant.

John W. Stokes, U. S. Atty., Steven W. Ludwick, Anthony M. Arnold, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before AINSWORTH and RONEY, Circuit Judges, and ALLGOOD *, District Judge.

AINSWORTH, Circuit Judge:

Appellant Harry Lloyd Davis was indicted for the offense of wilfully and unlawfully escaping from federal custody in the United States Penitentiary at Atlanta, Georgia, in violation of 18 U.S.C. § 751(a),[1] and was found guilty by a jury. On appeal, he attacks his conviction on the following three grounds: (1) that the jury-selection process in the Northern District of Georgia, under which the jury which convicted him was selected, failed to conform to the requirements of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–69 (hereinafter the Act); (2) that the trial court committed reversible error in excluding prison records offered by appellant; and (3) that the prosecutor made improper comments at trial, including references to appellant's post-arrest silence. For the reasons enumerated below, we affirm the conviction.

---

* Senior Judge for the Northern District of Alabama, sitting by designation.

1. Both the indictment and the judgment and commitment refer to 18 U.S.C. § 741(a). However, it appears that those references were typographical errors, since the federal escape statute is section 751.

### I. The Jury Selection Challenge

Defendant's principal attack on his conviction is aimed at the process of jury selection in the Northern District of Georgia. He presses three arguments in this regard. First, he contends that the jury-selection system violated the provisions of both the Act and the local jury-selection plan[2] by denying the public access to the computerized selection of prospective jurors. Second, he asserts that those functions of the selection process which were performed by the GSA personnel and computer in the absence of supervision by court officials violated the provisions of the Act and the plan requiring management of the process, and performance of particular functions, by the clerk or jury commission. Third, he contends that the jury clerk utilized "volunteers" in the selection process in violation of 28 U.S.C. § 1866(f). Defendant's attorney conceded at oral argument that no volunteers were used in the instant case. Therefore, that issue is not in dispute and we need not reach it. The issues of public access and delegation to the GSA remain.

After the trial in this case, defendants in twenty-seven other cases moved, based on similar challenges to the jury-selection system here at issue,[3] to dismiss indictments and stay proceedings. A hearing was held before two United States magistrates, a transcript of which has been made a part of this record, and the magistrates issued findings of fact and conclusions of law which were adopted by the district court in all twenty-seven cases. The essential facts developed in that hearing are as follows.

Jurors in the Northern District of Georgia are chosen by a process of random selection which utilizes computers. The system originated with the voter registration list, containing over 1,000,000 names. Through an objective qualifying process and two stages of random selection, those names were winnowed to a far smaller pool from which the veniremen were eventually drawn.

■ In the first stage, the names on the voter registration list were reduced to 25,000 in number and were placed in the master jury wheel.[4] The selection was made at random, involving the use of a quotient (determined by a mathematical formula) for drawing the desired number of names, and a starting number selected by chance.[5] The names in the master wheel were drawn manually for almost all counties in the clerk's office.[6] The clerk mailed a juror qualification form to each person whose name appeared in the master wheel, and a separate qualified wheel, consisting of those

2. Second Amendment to Plan for Random Selection of Grand and Petit Jurors for the Northern District of Georgia, Feb. 14, 1975 [hereinafter Local Plan] (incorporating provision for use of electronic data processing for jury administration), approved, Fifth Circuit Reviewing Panel, May 6, 1975. See 28 U.S.C. § 1863.

3. Our decision herein, with respect to the jury-selection challenge, also applies to *United States v. Roberts*, 5 Cir., 1977, 546 F.2d 596; *United States v. Wyers*, 5 Cir., 1977, 546 F.2d 599; and *United States v. Sherriff*, 5 Cir., 1977, 546 F.2d 604, which we have likewise decided today.

4. A master jury wheel was kept in each of the four divisions within the district.

5. For example, in the Atlanta Division, a quotient of 51 was used to reduce 761,000 names to 15,000—the amount desired. Slips of paper numbered from "1" to "51" were placed in an envelope from which one was drawn bearing the number "41," which thus became the starting number. Accordingly, the forty-first name and every fifty-first name thereafter were drawn to constitute the master wheel.

6. For all but four counties in the district, the entire voter registration lists were furnished to the clerk. In four counties, however, those lists were kept on computers. The clerk's office furnished county officials in the latter counties with instructions for accomplishing the same type of random drawing by computer as the clerk's office performed manually, utilizing the quotient and starting number determined by the clerk. The county officials would then furnish the clerk with a printout of the selected names plus a certification of what had been done. Although that practice does raise a delegation issue similar to, and yet discrete from, that raised with respect to the GSA function in the jury-selection system, we hold that the general reasoning of this opinion pertaining to the GSA activities is applicable to the function of the county officials described herein.

persons who qualified, was then constructed.[7] Prior to the implementation of the computerized selection system herein in dispute, a marshal would draw slips bearing the names of qualified prospective jurors from the qualified wheel by hand each time there was a court order for new jurors.

The last step in the process—the actual drawing of the names for jury service—was changed in 1975 when the district court converted to a computerized system of jury selection.[8] Pursuant to a plan,[9] approved by the reviewing panel of the Fifth Circuit, the names in the qualified wheel were delivered to Jerry Mitchell, a GSA computer specialist.[10] Mitchell was designated "a representative and officer of [the district] court" for the purpose of introducing the names on the qualified wheel into the computer system.[11] He had the names keypunched and put onto magnetic tape. He then returned the original slips of paper to the clerk, along with a computer printout of those names.[12]

The computer program utilized in the jury-selection process was developed by a GSA employee in the GSA's Fort Worth, Texas, office. However, the computer facility employed in the process was located at the GSA Data Processing Center in Atlanta.

The mechanics at this stage of the selection process bear directly on appellant's claim of improper delegation. The system is triggered by a court order to the clerk to summon grand or petit jurors.[13] The clerk then computes a quotient based upon the number of jurors desired and the number of potential jurors' names remaining in the qualified wheel. The clerk also randomly draws a starting number, which is a number between one and the quotient. He then sends a transmittal letter to Mitchell indicating the starting number, the quotient, and the number of jurors sought.[14] Thus, the clerk's instructions need only be carried out mechanically. The information in the transmittal letter is keypunched and fed into the computer which, in turn, produces a printout of the names selected for jury duty, the completed and addressed summonses, and the number of names remaining in the qualified wheel after the selection. This material is mailed to the clerk who subsequently mails the summonses to prospective jurors. The computer's role in the process is automatic: the computer first picks the name at the starting number,[15] proceeds to count to the quotient number, selects that name, and then counts to the quotient number again and repeats this function until the entire group of jurors has been selected. The magistrates' report found that

[i]n performing this function the computer was merely performing a ministerial and mathematical process automatically, which had been previously performed manually. It exercised absolutely no discretion in determining who was to be selected for jury service.

At the magistrates' hearing, there was some testimony about the supervision and accuracy of the computer system. None of

7. A qualified jury wheel was also kept in each of the district's four divisions.

8. *See* Local Plan, *supra,* note 2. The plan also permitted the computerization of the earlier part of the jury-selection process, *i. e.,* the selection of names for the master wheel from the voter registration or actual voter lists.

9. *Id.*

10. The transfer of names in the qualified wheel for the Atlanta Division was done in accordance with an order by Chief Judge Edenfield of the Northern District of Georgia dated March 19, 1975.

11. *Id.*

12. The same procedure was followed for the three remaining divisions other than Atlanta in May 1975.

13. The mechanics are the same for the selection of both grand and petit juries, except that the former are selected from the entire district, while the latter are selected only from the division in which the jurors reside.

14. The transmittal also indicates, of course, the division from which the selection is to be made.

15. The names are kept on the magnetic tape in alphabetical order.

the GSA officials involved in the development, programming, and implementation of the electronic data processing system for the district court's jury selection have been deputized as clerks of the court. Mitchell is the only such official named as an officer by the court's order. Although he was sometimes present at the actual computer runs, none of the court's own members or employees was in attendance.

■ The basic computer program was tested for accuracy during its "debugging" phase in Texas. Therefore, it was not tested for accuracy either at the Georgia facility or on this particular jury list. The clerk's office verified to the GSA that the first computer printout was satisfactory. There was also testimony to the effect that no check was made regularly by the clerk's office to determine whether the computer was functioning properly. While we note these facts, they are not fatal to appellant's conviction. We do not belittle the importance of either supervision or testing of computer-assisted jury selection schemes. However, aside from the complained-of deviations, this appeal presents no evidence indicating either that the GSA failed to follow the specified procedures or that the computer failed to function properly.[16]

The facts surrounding public access to the jury-selection process must also be set forth. Until the filings of the motions in these cases, the clerk had never publicly announced the time and place of the computerized drawings.[17] It also appears that, with the exception of appellant's counsel, Henry, no one had ever requested to view a jury-selection run.[18] The GSA official in charge of the Atlanta computer facility maintained a policy whereby members of the public were not permitted into the computer room unless a particular user made a request on their behalf, in which case the request would be considered on an individual basis, and admission would depend upon the purpose of the visit. The policy with respect to jury-selection runs was no different than that concerning any other program. The reasons for the policy, the GSA official testified, include physical security of the equipment (which is worth over $1,000,000) and the tapes (which would be expensive to reproduce), the room's special atmospheric requirements as to air conditioning and humidity, and space limitations. He expressed fear of physical destruction of the computers or tapes by outsiders. The GSA official said that he would not honor a request for access unless the request came through the clerk's office, but that he would allow access to the room for the sole purpose of viewing the selection process. The clerk testified that he would certainly permit access to the selection process and that the GSA could not veto any such decision.

■ Defendant's public-access complaint is based on 28 U.S.C. § 1866(a), which provides:

> From time to time, the jury commission or the clerk shall *publicly* draw at random from the qualified jury wheel such number of names of persons as may be required for assignment to grand and petit jury panels. . . .

**16.** The clerk did discover a discrepancy between the number of names on the printout of the qualified wheel and the number of names that his own records showed were remaining in the qualified pool, after subtractions for those persons already selected. Although the clerk made no attempt to determine the reason for the discrepancy, there was testimony indicating that the cause might have been inaccuracy in the prior manual computations of the number of remaining names. Furthermore, the discrepancy was not substantial, according to the clerk's testimony.

**17.** Public announcement of both the drawing of the starting number in the clerk's office and the

automated drawing of the names at the computer center is required by the local plan. Notices to that effect are now posted in advance of the drawings.

**18.** On at least one occasion, Henry was denied an opportunity to view such a run. However, his request was made to, and denied by, Mitchell, rather than either the clerk of the court or the person in charge of the GSA Data Processing Center in Atlanta.

Prior to this litigation, there had not been any requests to view the drawing of the starting number in the clerk's office.

(Emphasis added.) *Cf.* 28 U.S.C. § 1864(a) (public drawing from master wheel). The local plan further requires that automated drawings be made public and be announced publicly in advance. Security reasons were offered for the GSA's cautious access policy. There was testimony, however, that public access is now and will continue being freely granted. We are not faced with the problem, therefore, of correcting this deficiency in the jury-selection system for prospective application, but only with the need to determine whether this error entitles defendant to relief.

It will not suffice for defendant merely to show that the public-access provision was violated. The exclusive ground for challenging jury-selection procedures under the statute is "substantial failure to comply" with the Act. 28 U.S.C. § 1867(a), (e). This circuit has applied the statutory standard. *See United States v. Evans,* 5 Cir., 1976, 526 F.2d 701, *cert. denied,* —— U.S. ——, 97 S.Ct. 62, 50 L.Ed.2d 78. *Accord, United States v. Armsbury,* D.Or., 1976, 408 F.Supp. 1130; *United States v. McDaniels,* E.D.La., 1973, 370 F.Supp. 298, *aff'd sub nom., United States v. Goff,* 5 Cir., 509 F.2d 825, *cert. denied,* 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975). As this court observed in *Evans :*

> Congress, recognizing that there would undoubtedly be error in the jury selection process that should not result in the dismissal of an indictment, left room for harmless error by providing that dismissal should lie only when there was a *substantial* failure to comply with the Act.
>
> . . .

*Id.,* 526 F.2d at 705. *See* H.R.Rep. No. 1076, 90th Cong., 2d Sess. 15, *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 1792, 1805.

"Not every failure to comply with the provisions of the Jury Selection Act will constitute a 'substantial' failure." *Armsbury, supra,* 408 F.Supp. at 1143. A complaint must rise beyond the allegation of a mere "technical deviation" or even a number of them. *See Evans, supra,* 526 F.2d at 703.

Determining the substantial compliance question requires that the alleged violations of the Act be weighed against the goals of the statute. *See, e. g., Evans, supra,* 526 F.2d at 705–06; *Armsbury, supra,* 408 F.Supp. at 1142. The major policy of the Act is that juries shall be "selected at random from a fair cross section of the community." 28 U.S.C. § 1861. Discrimination is prohibited in the selection process. *Id.* § 1862. Toward these ends, voter lists are the primary source of jurors' names, and the Act aims to determine disqualifications, excuses, exemptions, and exclusions based solely on objective criteria. H.R. 1076, 90th Cong., 2d Sess. 4, *reprinted in* [1968] U.S. Code Cong. & Admin.News at p. 1793. Although the public-access problem constituted a technical violation of the statute, that difficulty in no way affected the random nature or objectivity of the selection process. There is no evidence that this shortcoming "operate[d] to frustrate the goals of the Act." *Evans, supra,* 526 F.2d at 706.

If we were left in the dark about the procedures employed behind closed doors, or if we had reason to believe that there were any improprieties which had escaped detection as a result of non-public drawings, the result might be different. In such a case, of course, the concern would be not with the procedures themselves but rather with their effect on the random nature and objectivity of the selection. But, in the absence of such circumstances or allegations, we hold that the lack of public access to the automated drawings did not amount to "substantial failure to comply" with the Act.[19]

---

**19.** In *United States v. Dalton,* 5 Cir., 1972, 465 F.2d 32, *cert. denied,* 409 U.S. 1062, 93 S.Ct. 570, 34 L.Ed.2d 515, we held, *inter alia,* that a grand jury selection in which the drawing took place in a room in the clerk's office where only clerk personnel were present withstood a challenge based on non-public drawing of the jurors' names. The court was influenced by the fact that the room was open to the public. Our case, of course, does not fit that rationale. Although *Dalton* is distinguishable on the facts, the case illustrates that a complaint of lack of public access in the jury-selection process is not the sort of deviation from the statutory scheme that this court is prone to view as substantial noncompliance with the Act.

The second prong of defendant's challenge to the jury-selection system attacks the delegation to the GSA of a role in that process. Defendant has framed the issue in terms of accountability. His claim, in essence, is that the Northern District's system has improperly delegated judicial responsibility to an executive agency, and that safeguards such as supervision and testing are lacking so that the court has no way of determining whether the statutory mandate is being followed.

The statute requires that each district's jury-selection plan "either establish a jury commission, or authorize the *clerk* of the court, *to manage* the jury selection process." 28 U.S.C. § 1863(b)(1) (emphasis added). Section 1864(a) provides that the clerk or a district judge shall draw the names of as many people as are necessary from the master jury wheel. The clerk or jury commission is then required to alphabetize the list of names drawn and mail the juror qualification forms to those people. *Id.* Section 1866(a) gives the clerk or jury commission responsibility for "maintain[ing]" a qualified jury wheel. It is the job of the clerk or jury commission to place in that wheel the names of those persons who were drawn from the master wheel, were qualified and were not excused or exempted. *Id.* Finally, the Act directs the clerk or jury commission to publicly perform the random drawing from the qualified wheel of names of persons needed for assignment to jury panels. *Id.* The local plan incorporates and implements the language of the statute.

Defendant asserts that this case concerns "the utilization of computer equipment in *private* by unknown employees of the General Services Administration," none of whom have been deputized as clerks of the court. Supp.Br. for Appellant at 4–5. The use of computers *per se* cannot be the difficulty in this case since the statute specifically permits the utilization of computers. According to section 1869(g), " 'jury wheel' shall include any device or system similar in purpose or function, such as a properly programmed electronic data processing system or device." Moreover, the local plan specifically provides for the use of electronic data processing methods in the selection of names from the voter registration lists *for* the master wheel, and *from* both the master and qualified wheels for ultimate service on juries.

Defendant makes much of the fact that none of the GSA personnel involved in the computer process were deputized as clerks of the court. The statute speaks of the "clerk" or "clerk of the court," and defines such official to mean the clerk or any authorized deputy clerk. *Id.* § 1869(a). When that definition is read in conjunction with those sections of the Act enumerating the particular functions and responsibilities of the clerk, and permitting the use of computers, the delegation issue becomes clear: how much are the clerk and his authorized deputies required to do personally?

We hold that the clerk and his deputies were not required personally to perform every mechanical step in the selection process, as long as they exercised all of the discretion at each step in the scheme where discretion was called for and permitted, and they exercised enough control over the system so that it was responsive to the mandates of the Act and the authority of the court. The magistrates' finding that the computer was "merely performing a ministerial and mathematical process automatically," and that it "exercised absolutely no discretion in determining who was to be selected for jury service" was not clearly erroneous and will not be overturned.

The findings adduced at the magistrates' hearing indicated that the critical steps in the selection process were the computation of the quotient and the drawing of the starting number. The utilization of the quotient operated to create drawings in which each name in the pool would have an equal chance at being picked, and selections would be made by passing over the entire file at regular increments so that the selection results would be balanced evenly across

the entire pool. The use of the random starting number removed the possibility of human discretion in the selection of any particular name so that all name selections would be unpredictable. *See Report of Committee on the Operation of the Jury System, Judicial Conference of the United States, Automation of Jury Clerical Work in United States District Courts* (Apr. 21, 1969) (App.A), *in the Jury System in the Federal Courts* 163–64 (West.Pamph.1973) (hereinafter *Automation of Jury Clerical Work*). Thus, the challenged scheme was designed to further the policy of the Act. The role of the GSA was simply to take the instructions on the transmittal and proceed accordingly in a purely automatic and mechanical manner. Therefore, the jury list which was ultimately drawn, "objectively, mechanically, and at random" from the voter registration list, is entitled to the presumption that it was, in fact, drawn from a representative cross-section of the community. *Thompson v. Sheppard*, 5 Cir., 1974, 490 F.2d 830, 833, *cert. denied*, 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975). And the magistrates found that it had that effect.

In *Thompson v. Sheppard, supra*, we held that a particular state jury-selection scheme involving the use of computers withstood a constitutional challenge based on racial discrimination. Although that case did not involve the Act here under consideration, the result in *Thompson* appeared to be influenced by the fact that the use of computers prevented the application of subjective considerations in the selection process. *Thompson*, therefore, although factually distinguishable from the instant case, indicates that the use of computers has been held by this circuit to further the same basic goals as are embodied in the Act. Furthermore, the type of automated selection process challenged in the instant case— one utilizing the services of the GSA. and employing a system of name selections keyed to a quotient and random starting number—has been recommended specifical-

ly by the Committee on the Operation of the Jury System of the Judicial Conference of the United States. *See Automation of Jury Clerical Work, supra*, at 151–70.

■ Defendant maintains that the court must have a computer expert in its employ who is able to verify the programs used in the jury-selection process, even if that function takes only a few hours a year. Moreover, defendant contends that the mere act of deputizing a GSA official as a clerk would suffice to validate the computer process, and that, accordingly, the absence of such deputization is fatal to the system. These assertions reflect an overly technical view of noncompliance. Furthermore, they make clear that defendant's challenge does not go only to the issues of delegation and access; the gist of his complaint is in effect an attack on computerization *per se* in the jury-selection scheme.

The day has passed when all the work of the clerk's office could be done by its personnel, manually performing each mechanical step of every routine task. The age of the computer is upon us. And Congress, in enacting this Act, and the Northern District of Georgia, in implementing its local plan, have fortunately caught the wave. Computers now perform a wide variety of functions in the administration of the courts. *See, e. g.*, LaBar, *The Modernization of Court Functions: A Review of Court Management and Computer Technology*, 5 Rutgers J. Computers & Law 97 (1975). The jury-selection process, in particular, lends itself to automation because of the substantive importance to the process of random selection and objectivity—both of which are promoted by electronic data processing. Forty-one federal judicial districts have automated their jury-selection systems.[20] Furthermore, the Judicial Conference of the United States has urged upon the courts the very type of system here at issue.

Accordingly, we will not thwart the welcome development of electronic data pro-

---

**20.** Memorandum from Norbert A. Halloran, Special Assistant to the Deputy Director of the

Administrative Office of the United States Courts, to District Court Clerks, Aug. 12, 1976.

cessing in jury selection by requiring that the clerk of the court perform each mechanical function in the computerized process or that one of his deputies be able to attest, based on personal knowledge and expertise, that the system is technically sound. The clerk's expertise is in court administration. However, there comes a point at which the clerk must be able to rely also upon the expertise of others. It is enough, therefore, that the clerk, under the ultimate supervision of the court, take all reasonable and necessary steps to see that a randomized, objective and reliable system of jury selection is established and maintained, and that he or his deputies exercise all the discretion at every point in the process where there is room for discretion or choice.

 We hold, therefore, that the delegation to the GSA computer personnel of a role in the selection scheme at bar did not amount to substantial failure to comply with the Act.[21] For the aforementioned reasons, we see no violation of the separation-of-powers principle either, for the GSA's performance of these mechanical functions did not amount to an unconstitutional delegation by the judicial branch of its responsibilities to an executive agency.

## II. Other Issues

 Appellant Davis next assigns as error the trial court's exclusion of prison records showing that appellant had a favorable work record and was making progress toward rehabilitation. Davis claims that these records constituted character evidence which went to the issue of intent, i. e., that his awareness that he was making progress toward rehabilitation and release appeared to negate the likelihood of wilful escape. This theory was consistent with the defense of coercion which defense counsel advanced in his opening statement at trial.

Rarely and only upon a clear showing of prejudicial abuse of discretion will appellate courts disturb the rulings of trial courts in the admissibility of character evidence. *United States v. Trollinger*, 5 Cir., 1969, 415 F.2d 527; *Wilcox v. United States*, 5 Cir., 1967, 387 F.2d 60; *French v. United States*, 5 Cir., 1956, 232 F.2d 736; *see Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *cf. Kilgore v. United States*, 5 Cir., 1972, 467 F.2d 22. Notwithstanding Davis' coercion defense, the exclusion of the prison records was neither an abuse of discretion nor was it prejudicial. Nothing in the Federal Rules of Evidence

**21.** There is further support in the reasoning of *Evans, supra*, for the result we reach today. In *Evans*, the court recognized that technical errors in the selection process had been made and that the clerks, rather than a judge, had made the determinations as to prospective jurors' excuses, exemptions and disqualifications. The judge had not given written authorization to the deputy clerks to grant excuses, but said he was aware that they were making such decisions and often conferred with them in that regard. The appellants there argued that the Act and local plan required the judge to make the determinations himself, and that the indictments must fall for want of judicial supervision of the selection process. The court rejected that argument, holding that the "improprieties in the selection process did not operate to frustrate the goals of the Act." *Id.*, 526 F.2d at 706. We believe the *Evans* rationale applies with even greater force to the instant case. Since the delegation there from judge to clerk was not fatal to the validity of the selection process, a delegation from the clerk to the GSA computer personnel is even less problematic. The Act mentions the specific functions of the selection process, and gives the clerk or jury

commission managerial authority over that process. Nevertheless, Congress was concerned less with fixing the day-to-day activities or management of the scheme in a given office than with locating "ultimate responsibility in the hands of the district judge." H.R.Rep. No. 1076, 90th Cong., 2d Sess. 9, *reprinted* in [1968] U.S.Code Cong. & Admin.News, pp. 1792, 1799. Here there was no real doubt raised that the judge exercised such responsibility, the "final supervisory authority over the day-to-day operation of the selection system." *Id.* To the extent that there were complaints about a want of judicial supervision, *e. g.*, the allegation that judicial officers never observed the actual computerized selection runs, the magistrates found that viewing the procedure would reveal only "the figures [being] fed into the computer, whirling magnetic tapes and a printed form being produced as the end product thereof." Such meaningless visual observation of the computerized selection run was not what Congress contemplated by "final supervisory authority." Therefore, the delegation of merely mechanical functions to the GSA did not violate the basic scheme envisioned by the statute.

cited by appellant [22] suggests a contrary result. Therefore, this assignment of error is without merit.

Appellant Davis also alleges improper prosecutorial comment, argument and questioning of witnesses in a number of particulars. Specifically, appellant contends that the prosecutor asked several questions for which the factual premises were never proved, so that unsubstantiated facts were placed before the jury; [23] that the prosecutor twice asserted a personal belief as to these matters; and that he made improper and unsupported comments in his closing argument. It is alleged that in the totality of circumstances, due process has been denied. We consider together the various instances in the alleged pattern of prosecutorial misconduct, and give separate treatment only to one issue which is of greater importance and is discussed *infra*, pertaining to prosecutorial comment upon appellant's silence after his arrest and receipt of *Miranda* warnings.[24] We do not view the group of allegedly improper questions and comments in the abstract. Our task is to consider their impact in the context of this particular trial. *See United States v. Hyde*, 5 Cir., 1971, 448 F.2d 815, 847, *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972).

Davis' contention of improper prosecutorial questioning pertains to cross-examination at trial. The scope of cross-examination is a matter within the trial court's sound discretion, and error will be found only upon a showing of abuse of that discretion. *United States v. Markham*, 5 Cir., 1976, 537 F.2d 187, 196. Having examined the record, we find that the trial court's rulings in this area [25] were within the bounds of its discretion. Appellant's contention as to the prosecutor's assertion of personal belief in the matters under inquiry [26] is without merit, and requires no detailed discussion. The test of whether the prosecutor's closing argument was improper and prejudicial [27] is whether substantial rights of the defendant may have been affected. *United States v. McDowell*, 5 Cir., 1976, 539 F.2d 435, 438; *United States v. Bell*, 5 Cir., 1976, 535 F.2d 886, 888.

**22.** Fed.R.Evid. 106, 401, 404(a)(1), 405(b), 701 and 803(6). Relying mainly on rule 404(a)(1), which pertains to the admissibility of evidence of a pertinent character trait of the accused, appellant argues that the records indicate good conduct and work habits which can be construed as character-trait evidence. He maintains that his method of proof consisted of specific instances of conduct, and thus was authorized by rule 405(b). He asserts, furthermore, that the evidence was relevant, within rule 401. Finally, appellant argues that the prison officials' opinions in the records were admissible lay opinion, under rule 701; that the opinions fell within the business-record exception to the hearsay rule, under rule 803(6); and that the Government's introduction of certain prison documents entitled appellant to introduce the remainder of the record, pursuant to rule 106. It will suffice to say that the rules cited by appellant do not compel his conclusion.

**23.** It is unnecessary to reproduce the full text of these remarks since they do not raise issues of substantial merit. For example, appellant complains about prosecutorial questions as to whether Harp, a key defense witness, testified only because the trip to court presented an opportunity for his own escape from custody; whether the appellant had been captured while driving the car of a fellow inmate who had previously escaped; and whether the appellant was a homosexual friend of that inmate. The witnesses answered in the negative to the first two of the preceding questions. As to the third issue, it was only arguable that there was an allusion by the prosecution to homosexuality; moreover, that question was indirect and Davis answered in the negative.

**24.** *Miranda v. Arizona*, 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966).

**25.** The court overruled objections by defense counsel to the prosecutor's various remarks challenged herein.

**26.** In response to a motion to strike, made by defense counsel, on the basis of lack of evidence, the prosecutor merely stated: "The test is that I have a reasonable belief in the questions that I ask." There was a second motion and response to the same effect.

**27.** Appellant challenges remarks which: (1) suggested that the defense's trial strategy was designed, in part, to produce collusive testimony, and (2) allowed the jury to draw an inference that appellant told his lawyer that he had robbed a bank.

Under the circumstances, we cannot say that there was prejudice or that substantial rights of appellant herein were violated. *See Bryant v. Caldwell,* 5 Cir., 1973, 484 F.2d 65, *cert. denied,* 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974). In sum, we find no merit to appellant's contentions as to the group of prosecutorial comments and questions. *See Hyde, supra,* 448 F.2d at 846–47.

 Appellant's last contention is that the prosecutor improperly commented upon appellant's silence after he had been arrested and given the *Miranda* warnings. This assertion raises a more serious issue than did the allegations pertaining to the rest of the challenged comments, but it does not reveal a reversible error. The remarks in contention are reproduced in the margin.[28]

In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that the use for impeachment purposes at trial of a defendant's post-arrest silence after he has received the *Miranda* warnings violates the due process clause of the fourteenth amendment. There the Court found to be improper portions of cross-examination in which the prosecutor repeatedly asked defendants about their failure to tell their exculpatory story at the time of their arrest. Although the Court reversed the convictions in *Doyle,* the opinion clearly suggested that the result might have been different had the state claimed that the impeachment use of silence, in the circumstances of that case, was harmless error.[29] Thus the *Doyle* rule requires a case-by-case application and permits a finding of harmless error.

This court recently applied *Doyle* in *United States v. Harp,* 5 Cir., 1976, 536 F.2d 601, a case upon which appellant relies. *Harp* was a case in which the prosecutor "highlighted" in his closing argument the fact that defendants, who raised a defense of duress to a prosecution for escape, had never told prison officials their exculpatory version of events. The court, reversing the convictions therein, held that, under *Doyle,* the prosecutor could not use defendants' silence to defeat their defense. However, we there established an apparent requirement that, to reverse a conviction, "the prosecutor's comments str[ike] at the jugular of [defendant's] story." 536 F.2d at 603. Otherwise, the remarks are harmless. *See id.* In *Harp,* the prosecutor's remarks were extremely sharp, and the comment upon defendants' silence was an explicit attack on their version of the facts. *See id.* at 602 n. 2.

The instant case does not present a prosecutorial focus—by repetitive questioning—

---

**28.** During the prosecutor's cross-examination of appellant, the following colloquy took place:

Q: And you were brought back to Atlanta Federal Penitentiary, is that correct?
A: I was.

. . . . .

Q: And when you walked in the gate did you, you know Mr. Moseley who testified here?
A: Yes.
Q: Okay, when you walked in the gate, did you go up and at any time tell Mr. Moseley what had happened?
A: No.
Q: Did you tell anybody what had happened?
A: No.

The prosecutor also made the following comments during his closing argument:

Now, defense counsel throughout his argument tried to bring it out, kept using one word, and especially right here a few minutes ago, terror, terror, terror, terror, terror in Harry Lloyd Davis' mind, terror.

. . . . .

If Harry Lloyd Davis were terrorized, wouldn't he at some time have done something to extricate himself from this ridiculous predicament? When he was arrested wouldn't he have said, "Gosh, don't send me back to the Atlanta Federal Pen, I'm in trouble"?

He didn't say that. He went back to the penitentiary, and he got along beautifully. And why did he get along beautifully? Because this thing never happened, ladies and gentlemen. This is a story that they made up since he went back to the penitentiary.

**29.** The Court stated in *Doyle:* "The State has not claimed that such use in the circumstances of this case might have been harmless error. Accordingly, petitioners' convictions are reversed . . . ." 426 U.S. at 619, 96 S.Ct. at 2245.

on a defendant's silence, as in *Doyle*. Nor can we say that the comments, in the context of either the cross-examination of Davis or in the prosecutor's closing argument, so "highlighted" appellant's silence as to constitute prejudicial error.

Similarly, we cannot say that the comments—even in the prosecutor's closing argument—"struck at the jugular" of appellant Davis' story. Davis admitted he had escaped. Furthermore, his defense of coercion was paper-thin and was undercut by his own testimony. Davis' counsel asserted in his opening statement at trial that appellant had left his custody out of fear of bodily harm at the hand of another inmate for failure to comply with the latter's request to bring contraband into the prison. When pressed under cross-examination as to whether he felt endangered or had been threatened, however, Davis declined to answer affirmatively.[30] His own testimony alleged a much more indirect and flimsy kind of duress, namely, that he might have had to fight Harp, his alleged prison antagonist, and thus might have gotten into trouble with prison authorities, consequently jeopardizing his prospects for release.

The preceding observations suggest the *Doyle* rule's inapplicability to the instant case.[31] The challenged remarks did not have an intolerably "prejudicial impact," *see United States v. Hale*, 422 U.S. 171, 179–180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975), in these circumstances. When read in the context of the entire cross-examination and closing argument, these remarks were not prejudicial to appellant, considering the overwhelming evidence of his guilt. *See, e. g., Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Therefore, we hold that the error, if any, was harmless.

AFFIRMED.

---

30. Although the witness Harp testified that he had threatened Davis, Davis' own testimony in that regard is more revealing:

Q: Now, Mr. Davis, well, I guess it is your position, and correct me if I am wrong, that you were threatened by Mr. Harp?
A: I have not testified that I was threatened.
Q: That's what I'm asking you.
A: I have nothing to say about it. In a matter like that if I had any comment, I would have made it out there.
Q: Well, you heard Mr. Harp's testimony?
A: I did.
Q: Is what he said true?
A: That was Mr. Harp's testimony. I refuse to talk about it.

. . . . .

Q: You felt in danger, though, right?
A: Well, let's say this, I thought what I was doing was lesser of several evils.
Q: My question, Mr. Davis, and try to answer my question, is, did you feel in danger?

. . . . .

A: Well, yes, I could have felt endangered; but the thing was, I didn't go at it from the point of in danger. I am a grown man and I can take care of myself.

What I was thinking about was getting out of the penitentiary and staying out, and I knew that if I stayed in the penitentiary, that I wasn't going to enhance my position towards that goal, that I was going to end up one way or another in serious trouble. So I felt that I had to leave.

31. This court has not considered the *Doyle* rule as an absolute one. Thus, we apply the principle therein on a case-by-case basis, as illustrated by two of our recent decisions. For example, in *Mercado v. Massey*, 5 Cir., 1976, 536 F.2d 107, we distinguished the holding in *Doyle* and held that a prosecutor's remark in closing argument which related to the defendant's silence at time of arrest did not impermissibly reflect on defendant's exercise of the constitutional privilege against self-incrimination. Less than two months later, in *United States v. Luna*, 5 Cir., 1976, 539 F.2d 417, in a per curiam opinion, a panel of this court held that prosecutorial remarks in closing argument relating to the defendant's silence at time of arrest violated the *Doyle* rule. We therefore depend upon the circumstances of each case for our ultimate decision.