UNITED STATES of America,
Plaintiff-Appellee,

v.

Daniel J. EVANS, William K. Beck,
and George W. MacFadden,
Defendants-Appellants.

No. 75–1541.

United States Court of Appeals,
Fifth Circuit.

Feb. 2, 1976.
Rehearing and Rehearing En Banc
Denied March 15, 1976.

702

James M. Russ, Michael F. Cycmanick, I. Paul Mandelkern, Orlando, Fla., for defendants-appellants.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Mark L. Horwitz, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

GEWIN, Circuit Judge:

William Beck, Daniel Evans, and George MacFadden appeal from judgments of conviction entered after trial by jury in the United States District Court for the Middle District of Florida at Orlando. The indictment charged the appellants in four counts with violations of the federal laws governing the manufacture and use of destructive devices and explosives. Count I charged the appellants with conspiring, in violation of 18 U.S.C. § 371, to manufacture, possess, and use unregistered explosive bombs in violation of 26 U.S.C. § 5861(d) and (f) and 18 U.S.C. § 844(i); the other three counts charged the appellants with failing to register and pay the tax upon certain explosive devices in violation of 26 U.S.C. § 5822. At the close of the government's case a judgment of acquittal was entered on Count IV; the jury returned verdicts of guilty with respect to the remaining counts.

On this appeal the defendants contend that their convictions should be reversed for four reasons: (1) the procedure employed in the selection of the grand and petit juries by which they were indicted and tried substantially deviated from the requirements of both the federal Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq., and the implementing plan[1] in the Middle District of Florida; (2) violations of grand jury secrecy required a dismissal of the indictment; (3) the government failed to disclose *Brady* material prior to trial; and (4) the introduction of evidence of offenses not mentioned in the indictment was reversible error. In addition, appellant Beck individually contends that the trial court's denial of his motion to sever appellant MacFadden was reversible error. We affirm.

---

1. In the Jury Selection and Service Act Congress directed each district court to devise and place into operation a plan consistent with the provisions of the Act. 28 U.S.C. § 1863(a).

## I

Before commencement of trial each defendant, in accordance with 28 U.S.C. § 1867(a),[2] moved to dismiss the indictment on the ground of substantial failure to comply with the provisions of the Jury Selection and Service Act (the Act) and the Plan in selecting the grand and petit juries. After an evidentiary hearing the trial judge concluded that there had not been a substantial failure to comply with the Act or the Plan and denied the motions. Although we find that in a number of instances there were technical deviations both from the Act and the Plan, we hold that the sum of these departures is not a "substantial failure to comply" within the meaning of 28 U.S.C. § 1867(a).

The appellants do not level a challenge at the *composition* of the grand or petit jury; that is, they do not contend that any segment of the population was systematically excluded from jury service.[3] Nor do they contend that they were in any way prejudiced by errors in the selection process. Rather, they assert that the clerks simply failed to adhere to the procedure set forth in the Act and the Plan. The evidence adduced at the hearing shows that deputy clerks in the Middle District of Florida at Orlando began the process of refilling the master jury wheel on April 19, 1973. Some 7,915 names were randomly drawn from the voter registration lists of the counties that comprise the Orlando division. The clerks then sent juror qualification forms to each of the 7,915 persons. When these questionnaires were returned, the clerks reviewed them to determine which individuals should be exempt,[4] disqualified,[5] or excused.[6] On

2. 28 U.S.C. § 1867(a) sets forth the procedure for challenging compliance with jury selection procedures:

In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

3. The Constitution forbids the systematic exclusion of identifiable segments of the community from jury panels. In the recent case of *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Supreme Court observed:

It should be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to any particular composition [citations omitted], but the *jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.*

419 U.S. at 538, 95 S.Ct. at 702, 42 L.Ed.2d at 703 (emphasis added).

4. Section VII of the Plan of the United States District Court for the Middle District of Flori-

da for the random selection of grand and petit jurors provides that members of the following groups are exempted from jury service.

1. Members in active service in the Armed Forces of the United States.
2. Members of the fire or police departments of any state, district, territory, possession or subdivision thereof.
3. Public officers in the executive branches of the Government of the United States, or any territory or possession thereof, who are actively engaged in the performance of official duties.

5. Section VII of the Plan provides that a potential juror shall be deemed qualified to serve on grand and petit juries unless he

1. is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;
2. is unable to read, write and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
3. is unable to speak the English language;
4. is incapable by reason of mental or physical infirmity to render satisfactory jury service; or
5. has a charge pending against him for the commission of, or has been convicted in a state court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

6. Section VI of the Plan provides for excuse from jury service, upon request, of members of the following groups:

1. Actively engaged members of the clergy.

the basis of information on the 7,318 completed jury questionnaires, deputy clerks determined that 1,878 people should be excused, exempt, or disqualified from jury service. The remaining 5,440 names were placed in the qualified jury wheel. Both the grand jury that indicted the appellants and the petit jury that tried them were drawn from this qualified wheel. It also appears that after the drawing of names for the grand jury by which appellants were indicted, several persons were excused or deferred for reasons asserted in a phone call or personal visit to the clerk's office.

Appellants cite numerous instances in which the procedure followed by the Orlando clerks allegedly deviates from the dictates of the Act and the Plan. For example, there should not have been an en masse mailing of juror qualification forms to every person in the master jury wheel. The Act and the Plan [7] provide that the names of as many persons as may be required for jury service shall be drawn from the master wheel "from time to time." Juror qualification forms are required to be mailed to all such persons whose names are drawn from the wheel.

The most glaring irregularity in this selection process, according to the appellants, was the clerks' usurpation and abuse of the judicial function of deter-mining excuses, exemptions, and disqualifications. Testimony taken at the hearing revealed that most of the decisions on excuses, exemptions, and disqualifications were made by the clerks themselves, although in questionable cases the clerks consulted the chief judge. The chief judge submitted a written statement in which he acknowledged that even though he did not by written order authorize the deputy clerks to grant excuses, he was "aware of the course of action pursued by the clerks and conferred frequently with each of the clerks in chambers concerning requests to be excused and the grounds therefor."

The appellants argue that 28 U.S.C. § 1865(a) and Section III of the Plan entrust the chief judge with the power to determine excuses, disqualifications, and exemptions, and that the absence of judicial supervision is fatal to the indictment. Although the statute specifically provides that in making these determinations the chief judge may act upon the recommendation of the clerk, counsel for appellants at oral argument contended that deputy clerks simply do not have the legal knowledge to make the ultimate decisions.

Appellants argue that not only did the clerks usurp the chief judge's power, they abused it. They enumerate several instances [8] where the clerks deviated

---

2. Women who have legal custody of a child or children under the age of 10 years.
3. Actively practicing attorneys, physicians, dentists, and registered nurses.
4. Persons who have served as grand or petit jurors in a federal court within the past two years.
5. All persons over 70 years of age at the time of executing the jury qualification form.
In addition, the Plan provides that "[t]he court may, in its discretion, excuse persons summoned for jury service upon a showing of undue hardship, extreme inconvenience, or other grounds of exclusion as set forth in section 1866 of the Act, for such period of time as the court may deem necessary and proper."

7. Section V(a) of the Plan, which incorporates the provisions of 28 U.S.C. § 1864, provides in part:
From time to time as directed by the district court, the clerk or a district judge shall pub-licly draw at random from the master jury wheel the names of as many persons as may be required for jury service. . . . The clerk . . . shall mail every person whose name is drawn from the master jury wheel a juror qualification form accompanied by instructions to fill out and return the form . . .

8. The data on which appellants rely to demonstrate arbitrariness was accumulated in an *ex parte* analysis of all the juror qualification forms that were returned. The results of this analysis were never introduced into evidence, although the appellants state that the district court relied on the data in reconsidering the motion to dismiss because of deviations from the Act and the Plan in the selection of the jury panels. The validity of this analysis was seriously challenged by the government both in its brief and at oral argument.

from the Plan. For example, it appears that not all citizens over 70 years old were exempted,[9] as the Plan required. The result of this deviation was that the names of some senior citizens were *included* in the qualified jury wheel. The appellants cite a number of instances where the clerks deemed qualified firemen, policemen, and servicemen who, under Section VII of the Plan and § 1863(b)(6) of the Act, should have been exempted. The result of this deviation was, again, an *inclusion* of names of persons who should have been considered exempt.

The appellants further cite apparently inconsistent instances of the treatment of women with young children, who, under Section VI of the Plan, should have been excused if they so requested. According to testimony at the hearing below, the clerks did not excuse working mothers of young children, even if they so requested.[10] Again, this variance from the Plan resulted in an *inclusion* of a group arguably entitled to be excused. There may also have been disparate treatment of the sick [11] and of those who indicated jury service within the past two years,[12] but again the end result of these deviations appears to be an *inclusion* of names that should not have been included.[13]

The appellants also allege additional deviations from the Act and the Plan: the failure of the clerks to prepare an alphabetical list of all the names drawn from the master jury wheel; the failure

to prepare a Jury Selection Report; and the failure to replace in the qualified jury wheel the names of those persons who were excused or temporarily deferred from jury service.

Congress, recognizing that there would undoubtedly be error in the jury selection process that should not result in the dismissal of an indictment, left room for harmless error by providing that dismissal should lie only when there was a *substantial* failure to comply with the Act. An analysis of the question whether there has been substantial compliance with the Act requires a review of the purpose of the Act and its underlying policy. Section 1861 contains the declaration of policy:

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

Section 1862 implements this cross-sectional policy by proscribing discrimination in the selection process:

No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on

---

9. At one time during the selection process, the Plan provided that persons over 70 years old should be exempt from jury service. The Plan was amended in 1973 to provide that those over 70 should be excused upon request, rather than exempted. See note 6, *supra*.

10. The clerks apparently felt that the excuse for mothers of young children was premised on the need of these mothers to be at home with their children. They felt that if a mother were employed outside the home, she should not be permitted to avail herself of this excuse.

11. An excuse for reasons of physical health, unless accompanied by a doctor's certificate, was not honored if it appeared from the ques-

tionnaire that the potential juror was employed. The clerks apparently reasoned that a person healthy enough to work would be physically able to render jury service.

12. Section VI of the Plan provides for excuse *upon request* of persons who have served on federal juries. *See* note 6, *supra*. One obvious reason that some members of this group may not have been excused is their failure to file a request.

13. Once a group of jurors was called for actual service, any member of that group who felt himself entitled to an exemption, excuse, or disqualification could have presented the relevant facts to the judge conducting voir dire examination and been reclassified at that time.

account of race, color, religion, sex, national origin, or economic status.

According to the legislative history, H.R. 1076, 90th Cong., 2d Sess., U.S.Code Cong. & Admin.News, 1968, p. 1792 the Act

> . . . embodies two important general principles: (1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

*Id.* at 1793. The appellants have not shown a contravention of either of these principles. They do not even allege that the original 7,915 names were not randomly selected as required by the first principle.

Nor have appellants shown that in determining juror qualifications the clerks applied any non-objective criteria in violation of the second principle. The legislative history indicates that this principle was adopted to prevent the "widespread current practice of imposing qualifications above and beyond those specified by Congress." *Id.* at 1795. Jury officials had treated the juror qualifications in the act that preceded the legislation now in force merely as minimum qualifications to which they added such subjective notions as "good character" and "sound judgment." This practice, though perhaps well-intentioned, had on occasion produced discriminatory results. *See Rabinowitz v. United States,* 366 F.2d 34 (5th Cir. 1966) (en banc).

■ The evidence does not establish that the Orlando clerks applied only extra-statutory, subjective criteria in the screening process. Rather, the clerks determined juror qualifications solely on the basis of the criteria specified in the Act and without a discriminatory result. While some technical errors were made, the fact that clerks, rather than a judge, made these determinations does not necessitate reversal. *Cf. United States v. Butera,* 420 F.2d 564, 574 (1st Cir. 1970).

■ The only post-Act authority upon which the appellants rely is *United States v. Zirpolo,* 450 F.2d 424 (3d Cir. 1973). The *Zirpolo* court found that the challenged jury selection procedure, in which there was no finding by a district judge of the statutory criteria for exclusion, exemption, and disqualification, constituted a patent violation of both the spirit and the letter of the Act. The procedure followed in *Zirpolo,* however, had favored males over females in a two-to-one ratio, frustrating the Act's goal of a representative cross-section of the community. In the case now before us there has been no showing of a thwarting of the Act's goals. The overwhelming majority of the errors alleged to have been committed by clerks in the screening process appear to have resulted not in the discriminatory exclusion from jury service against which the Act was intended to safeguard, but rather in the *inclusion* of persons who perhaps should have been relieved of jury duty. There may have been isolated examples of mistaken exclusion, but these alone do not afford a valid basis for challenging the grand jury.[14] *United States v. Matthews,* 350 F.Supp. 1103 (D.Del.1972).

In sum, no person or group was excluded from jury service on the basis of race, color, religion, sex, national origin, or economic status. No person was shown to have been rejected because of any extra-statutory, subjective criteria. The improprieties in the selection process did not operate to frustrate the goals of the Act. While we in no way mean to imply that the role of the judiciary should be lightly regarded, we conclude

---

**14.** Appellants have challenged both the grand and petit jury panels. The bulk of their arguments, however, concerns the grand jury selection process.

that these deviations in the selection process do not constitute a substantial failure to comply with the Act or the Plan.

## II

■■ We find appellants' other contentions less troublesome. They complain that there was a violation of Fed. R.Crim.P. 6(e), which prohibits the disclosure of matters occurring before the grand jury to anyone other than a government attorney. The basis for this complaint is that several documents subpoenaed by the grand jury were later turned over to a special agent from the Treasury Department in the Alcohol, Tobacco and Firearms Bureau. This agent was assisting the United States Attorneys in their investigation of the case. Representatives of government agencies actively assisting United States Attorneys in a grand jury investigation and working under their direction may lawfully have access to grand jury material in the performance of their duties. *United States v. Hoffa,* 349 F.2d 20, 43 (6th Cir. 1965), *aff'd,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, *reh. den.,* 386 U.S. 940, 951, 87 S.Ct. 970, 17 L.Ed.2d 880 (1966); *In re 1973 Grand Jury,* 374 F.Supp. 1334, 1337 (N.D.Ill.1973); *In re William H. Pflaumer & Sons, Inc.,* 53 F.R.D. 464, 475 (E.D.Pa.1971); *United States v. Anzelmo,* 319 F.Supp. 1106, 1116 (E.D.La.1970).

## III

■ The appellants' third contention is that the government violated the dictates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose prior to trial certain evidence favorable to the accused: the fact that the dynamite bomb described in Count IV of the indictment was incapable of detonation. Count IV charged the appellants with manufacturing a destructive device in violation of 26 U.S.C. § 5822. Testimony elicited during the government's case-in-chief established that on two occasions the government

had unsuccessfully attempted to detonate the bomb. A judgment of acquittal was entered as to Count IV, and the appellants moved for a mistrial. They contended that the government's failure to disclose prior to trial this allegedly favorable fact violated their rights of due process. They further argued that if the government had disclosed the fact of non-detonation, they could have moved to dismiss Count IV from the outset and this prejudicial evidence would never have come before the jury. The motion was denied.

There was no error in the denial of this motion. At the outset, it should be noted that this supposedly favorable evidence was not suppressed. Moreover, we are not convinced that non-detonation of the destructive device is necessarily favorable to the accused. 26 U.S.C. § 5845(f)(3) defines a destructive device as "any combination of parts either *designed or intended for use* in converting any device into a destructive device . . . ." (emphasis added). The statute apparently does not require that a device be successfully detonated before it can be considered a bomb. Expert witnesses testified that the device was a dynamite bomb and that it might have been capable of detonation if the dynamite had been permitted to dry. Lastly, testimony regarding this bomb would have been admissible under Count I, which charged a conspiracy, even if the court had dismissed Count IV before trial.

## IV

■ In Count I the appellants were charged with conspiring to manufacture and use destructive devices. Fifteen overt acts were alleged in furtherance of the conspiracy. At trial a government witness testified to numerous criminal acts by the appellants not alleged in the indictment, but occurring during the life of the conspiracy. Before the testimony was received the trial court instructed the jury, "The testimony is being admitted for whatever probative value, if any,

it might have as evidence that a conspiratorial agreement existed as alleged in Count One of the indictment." These other criminal acts were closely connected in time and nature to the overt acts alleged in Count I; their admission into evidence is not reversible error. *United States v. Crockett,* 514 F.2d 64 (5th Cir. 1975); *United States v. Arias-Diaz,* 497 F.2d 165, 170 (5th Cir. 1974); *United States v. Gonzalez,* 491 F.2d 1202, 1205 (5th Cir. 1974); *United States v. Nakaladski,* 481 F.2d 289, 296 (5th Cir. 1973).

V

Finally, there was no abuse of discretion in the denial of Beck's motion, at the close of the government's case, that MacFadden be severed so that he could present testimony favorable to Beck. In *Byrd v. Wainwright,* 428 F.2d 1017 (5th Cir. 1970), we set forth guidelines to aid trial courts presented with motions to sever based on the desire to offer exculpatory testimony of a codefendant. We stated that an inquiry may be made into the likelihood that the codefendant would be willing to testify if the defendant is tried separately. Beck did not show that there was a likelihood that MacFadden would be willing to testify at a separate trial when he was unwilling to testify in a joint trial. *See United States v. Burke,* 495 F.2d 1226, 1233 (5th Cir. 1974); *Gorin v. United States,* 313 F.2d 641, 646 (1st Cir. 1963). Persons jointly indicted, as a general rule, should be jointly tried, especially in conspiracy cases. *United States v. Perez,* 489 F.2d 51 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *United States v. Hutchinson,* 488 F.2d 484 (8th Cir. 1973). The motion came at the close of a lengthy government case. Considerations of administration and judicial economy weighed in favor of the court's denial of the motion.

Affirmed.